BLAKE CONSTRUCTION COMPANY and Ætna Casualty & Surety Company, Appellants,

v.

UNITED STATES of America, for the use and benefit of Jacob LICHTER and Jennie L. Lichter, partners, d/b/a and under the firm name and style of Southern Fireproofing Company, Appellees.

No. 16766.

United States Court of Appeals
Fifth Circuit.

Feb. 25, 1958.

Joel R. Wells, Jr., William S. Blalock, Orlando, Fla., Harry L. Ryan, Jr., Washington, D. C. (Maguire, Voorhis & Wells, Orlando, Fla., Whiteford, Hart, Carmody & Wilson, Washington, D. C., on the brief), for all appellants.

Fletcher G. Rush, Orlando, Fla., Paul W. Steer, Cincinnati, Ohio (Steer, Strauss & Adair, Cincinnati, Ohio, Pleus & Rush, Orlando, Fla., on the brief), for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is a minor, but heated, controversy growing out of the missiles program. To be sure, its resolution calls for no heady formulae in the field of astronautics. Ours is the more earthbound task of determining whether the plans and specifications for five missile assembly buildings called for one thing rather than the other. Launching this controversy into decisional finality, we must determine too the stage at which it orbitted into a liquidated demand for the commencement of interest. Subsidiary to this is the question whether a Court, rather than some other agency (Board of Arbitration) is to perform the count-down.

■ Except for the difficulty, spectacularly present in the comparable field of patent law, of portraying intricate structural detail by words, the main dispute is not too complex. In terms, it is whether the Subcontractor is entitled to $3,054.75 as an extra for furnishing and laying additional insulation block in the inside longitudinal walls on the mezzanine floor of these five buildings.

The Contractor[1] had the prime contract with the Government on the multimillion dollar project for the construction of vertical launching facilities and missile assembly buildings at the Joint Long Range Proving Ground, Missile Test Center, Cape Canaveral, Florida. Subcontractor,[2] for a bid of $138,000, had the masonry subcontract on the five buildings requiring it to furnish " * * all labor and materials * * * and equipment" and to perform " * * *

all work necessary to complete the erection of all concrete block and insulating block walls and partitions, setting of all precast concrete sills and glass block and caulking * * *."

Each of the five missile assembly buildings was a large hangar-like structure approximately 185 feet in width, 170 feet in depth, and an extreme, center, height of 47 feet. On the front and back, it was open for a width of about 130 feet. On each side of this opening, there was a long enclosed structure, approximately 27 feet in width consisting of a first and mezzanine floor. It is this part of the building with which we are concerned. In this enclosed part, the extreme outside wall was approximately 28 feet high. But the roof over this portion inclined slightly so that the inside wall was about 29 feet in height. At this point, this wall rose vertically for another 17 feet, so that the flat roof over the "hangar" door opening was approximately 47 feet above the ground level.

At the ends of the enclosed structure, on both first and mezzanine floors, were stair wells and substantial spaces separated by interior partitions for toilet, washroom and lounge facilities. These areas were so situated that of the 170 feet depth in the whole structure, that portion of the "inside" wall (next to the open hangar space) which actually enclosed the working area was about 140 feet in length. The similar part of the opposite (i.e., extreme "outside") wall was about 130 feet long. This area between these two side walls and the internal partitions separating it from adjacent stair wells and toilet areas was entirely enclosed with no movable windows or openings. It is undisputed that the plans and specifications called for the wall enclosing this area to be made up of concrete blocks of specified size on the "outside" laid adjacent to 4″ insulating non-load bearing blocks on the

1. Blake Construction Company, Incorporated. The action is nominally under the Miller Act, 40 U.S.C.A. §§ 270a–270c, against Contractor and its surety, but the controversy is, and has been treated as being, between Contractor and Subcontractor alone.

2. Jacob Lichter and Jennie L. Lichter d/b/a Southern Fireproofing Company of Cincinnati, Ohio.

"inside." Another company was to, and did, apply a bituminous vapor seal on the inside parged[3] surface of the concrete blocks prior to the time the Subcontractor laid the insulating block. In other words, whether in law this is considered as a single wall or, as Subcontractor contends, two adjacent "partitions", it is undisputed that Subcontractor was to install the concrete blocks and insulating blocks to make what was in fact a single wall.

The plan drawings plainly show that this double wall (of concrete block and adjacent insulation block), on the first floor, shall run from the ground level floor to the underside of the mezzanine floor beams, and for the mezzanine, from that floor to the underside of the structural ceiling-roof beams. The written specifications prescribed similar requirements.[4] On the first floor, this carried the double wall for the height precisely indicated on the plans, 13'4". On the mezzanine floor, the height for the outside wall was 12'0", but with the incline of the overhead roof, the inside (toward the hangar space) wall was 13'0".

It is here where the rub comes. For Subcontractor contends, as he always has, that while the plans and specifications called for the insulating block to run up to the underside of the floor or beams above, all this was either changed, or at least made obscure, by special notes written on the face of the sheets showing the floor plan for the first[5] floor and mezzanine[6] respectively.

Subcontractor's argument runs somewhat like this: (1) the special notes on the plans (see notes 5 and 6, supra) refer expressly to "masonry partitions of 4" concrete *or* insulating block" and presumably the disjunctive "or" was purposefully used; (2) while there are many (approximately 21) partitions in the toilet-lounge areas of 4" concrete blocks, there are none made exclusively of *insulating blocks;* (3) the only interior "partitions" of 4" insulating block are those which are laid immediately adjacent to the concrete blocks and separated only by the bituminous vapor seal; (4) therefore, it must have been intended that Contractor would install a poured concrete cap on the top of the 4" insulating block; and (5) since the Government did not require that this be done, Contractor has gained by the saving of the cost of the concrete cap, whereas Subcontractor has lost to the extent that it was necessary to furnish and lay insulating blocks for the vertical space which

---

3. The specifications 6–06 Erection of Masonry Units provided:

    "Where insulating block is to be applied to the inside of exterior walls, the inside face of the concrete masonry units shall be parged (back plastered) with mortar so as to provide a smooth, unbroken surface to receive the vapor seal as specified in the section on waterproofing; * * *."

4. The specifications 6–06 Erection of Masonry Units: e. Masonry Wall Construction provided:

    "In general, terminate walls against beam soffits or structural ceilings and wedge tight to ceilings or beams and slush joints at top with mortar."

    This is followed in context by the following provision which bears on the technical identification of "exterior" walls, the meaning of "wall" and the necessity for retaining an absolute vapor seal:

    "Partitions that abut exterior walls shall have the masonry units of the partitions properly bonded with the wall masonry, except that where insulating block is used, masonry partitions shall be bonded with insulating block using corrugated or crimped anchors, so that there is no break in the vapor seal. * * *."

5. Sheet 3 covering first floor:

    "Note: Interior masonry partitions of 4" conc. [concrete] or insulating block on first floor shall be constructed of block to a height of 13'4" and capped with 4" wide conc. [concrete] from top of block to underside of conc. [concrete] slab. Cap to be reinforced with 1 #4Ø T. & B."

6. Sheet 4 covering mezzanine:

    "Note: Interior masonry partitions of 4" conc. [concrete] or insulating block on mezzanine floor shall be constructed of block to a height of 12'0" and capped with 4" wide con. [concrete] from top of block to underside of roof deck conc. [concrete] cap reinforced with 1 #4Ø T. & B."

would have been occupied by the concrete cap.

As a corollary Subcontractor also contends that these notes made the plans ambiguous and thus authorized resort to parol evidence. In our disposition we need not determine whether, as is most doubtful, the conversations between Contractor and Subcontractor immediately preceding the signing of the formal contract had the claimed effect of an agreement that Subcontractor's interpretation was correct, or whether it was error[7] for the Court to have received the parol testimony. For we are of the clear opinion that no cap was called for and what the Subcontractor furnished and installed was exactly what the plans obliged him to do.

We start with the firm conclusion that "partition" as it is used in the notes (see notes 5 and 6, supra) obviously did not refer to that portion of the side walls made up of concrete blocks and insulating blocks laid together. While it may be true that to assure a perfect vapor seal, the two were not mechanically bonded together, this structure constituted a single wall and not a partition to separate one space off from another. The plans themselves show that "partition" was used in this sense. For in the toilet-lounge areas, there were, in each building, 21 free-standing 4″ partitions which all agree were to be made up of concrete blocks without an adjacent course of insulating blocks. Unlike the concrete blocks of the side walls which were bonded on each side and top and bottom into the adjacent strength members of the main structure, these partitions were free standing. To afford added stability, a concrete cap was prescribed.

Actually, the controversy likely had its genesis in the fact that in a literal application of the plans and specifications and the notes (see notes 5 and 6, supra)

to these toilet-lounge area partitions, it was going to be an almost impossible task to pour these caps on top of the concrete blocks in view of the location of certain overhead pipes and the limited space below the concrete floor or ceiling slab. In view of this, Contractor sought and obtained permission from the Government to delete the cap on the top. As an alternative the Engineers approved the pouring of a 6″ cap at a point somewhat lower in the concrete block partition. As this did increase the amount of *concrete* block to be installed, an extra in the amount of $2,241 was agreed to though not yet paid.

Equally important is the fact that the use of the cap in the side walls on the mezzanine floor made no sense. It is not that we now substitute ourselves as engineers. But in interpreting plans, we can read them in the light of the obvious purposes to be achieved. Here it is significant that Subcontractor seeks an extra for only one of four of the walls surrounding the enclosed space. Its justification—since it must obviously find one—is that for the first floor, the height shown by the plans, indicated specifically as precise measurements on the plans, and those prescribed in the note (see note 5, supra) were all the same—a height of 13′4″. Likewise it says that for the outside wall on the mezzanine, the measurements and note (see note 6, supra) all specify 12′0″. It is only the opposite side on the mezzanine where there is a difference (height from mezzanine floor to overhead beam is 13′0″), and it is this additional foot which, Subcontractor says, was filled with "extra" insulation blocks.

If a cap was neither prescribed nor needed—and this is admitted—on either of the first floor walls or on the outside wall of the mezzanine, there is no basis shown anywhere why one would have

---

7. The Contractor cites among others: Highway Construction Company of Ohio v. City of Miami, Fla., 5 Cir., 126 F.2d 777, certiorari denied 317 U.S. 643, 63 S.Ct. 35, 87 L.Ed. 518; Kilby Mfg. Co. v. Hinchman-Renton Fireproofing Co., 8 Cir., 132 F. 957. Subcontractor asserts that this was merely explanatory of doubtful terms and permissible under such authorities as Colonial Hotels, Inc. v. Maynard, 158 Fla. 318, 29 So.2d 28; Smith v. Manatee County, Fla., 56 So.2d 453.

been needed or would serve any useful function in the opposite mezzanine wall. We are fortified in this conclusion by the fact everywhere so apparent in this record that had it been reasonably required by the plans, the United States Engineers, as the proper and ubiquitous watchdog, would have insisted on absolute compliance or an express waiver.[8]

The result is that we hold that the District Court erred in allowing this sum of $3,054.75 as an extra.

■ This would not, however, result in an automatic rendition for the Contractor on this score if, as it so vigorously asserts, the case was always one for arbitration under the contract provisions and the Federal Arbitration Act, 9 U.S.C.A. § 1 et seq. We dispose of this quickly by saying that in this record we could certainly not find the District Judge to have been clearly erroneous, F.R.C.P. 52(a), 28 U.S.C.A., in his conclusion that the Contractor was in default and the request for stay of the judicial proceedings made for the first time as the actual trial got underway was a pure afterthought and came too late.

While we have now finally held against the Subcontractor's contention on the basic claim, this record reflects that Subcontractor was making every effort to negotiate and discuss this problem with the Contractor. In the extensive correspondence from Subcontractor, much of which went unheeded and even unanswered, Subcontractor indicated plainly its willingness to arbitrate. Typical of the Contractor's studied indifference to the demand for payment of the claim or arbitration was Contractor's summary rejection of the specific inquiries put to it as to the procedural details of the proposed arbitration even though these were matters left initially to the parties under the agreed American Institute of Architects rules for arbitration.

The Court was eminently justified in its implied conclusion that the so-called defense of arbitration and the tardy demand for it was not asserted in good faith so that Contractor was in default. American Locomotive Co. v. Chemical Research Corp., 6 Cir., 171 F.2d 115.

■ Despite our ruling on the basic issue of the extra for $3,054.75, the problem of interest still remains. This comes about because, while that basic issue was the center of the controversy, when the suit was instituted, it was necessary to include the demand for the additional sum of $14,725.61 over 90% of which was then admittedly due and owing. The Trial Court first allowed interest on the total ($17,780.36) of this amount plus the claimed extra from March 10, 1955. Subsequently this was modified to allow interest from September 10, 1955 down to the date of judgment, April 1, 1957.

Contractor asserts that the contract required final payment of the withheld retainage of 10% within thirty days after completion and acceptance of the whole project and, as modified by a contemporaneous letter, not earlier than forty-five days after *completion* of the whole project if *acceptance* were delayed on account of a dispute in which the Subcontractor was in no way involved. Consequently, it argues that Subcontractor did not satisfactorily establish that the *whole* project was either accepted or completed thirty or forty-five days, respectively, prior to the interest date, September 10, 1955, fixed by the Court.

As we view this, we need not determine the correctness of this precise point. The record overwhelmingly demonstrates that over this long period of extensive correspondence, efforts toward negotiation, and conferences ultimately held on the dispute, the refusal to pay was never based on the contention that the claim was premature or not yet due. The refusal was persistently and emphatically placed on absolute non-liability for the claimed extra (and some undisclosed disputes over a job in Baton

8. The letter from the Engineers of October 11, 1954, quoted in Contractor's letter of October 19 refers only to the toilet-lounge area and not, as now claimed, to this one particular inside wall on the mezzanine floor.

Rouge, Louisiana). Indeed, on September 29, 1955, after a conference finally held on September 23, 1955, Contractor sent a statement of account to Subcontractor showing an admitted balance *then* due of $12,940.84. This was sent with a release and the letter of transmittal stated that "If you will execute and return this release to us, we shall be pleased to forward you our check for this amount." This was not an offer to settle, generally inadmissible in evidence. Nor was it so treated. For on the trial, Contractor insisted that this itself amounted to a tender[9] sufficient to *stop* the running of interest.

The Court was entitled to treat it as did the Contractor—an acknowledgment of liability for a present indebtedness for whatever amounts were rightfully due under the contract and which Contractor fixed at the prescribed amount. If it was not an acknowledgment, as such, it was at least a sufficient indication that the Contractor considered the final balance, whatever it might be, due and owing under the contract so that, if this were not so, it was up to the Contractor to prove that in point of *time* the claim was premature. Since the difference between this tendered amount and the actual balance due ($14,725.61) was made up of asserted credits or chargebacks which the Court held were unfounded and no complaint is now made of this ruling, the Court was entitled to consider that the acknowledgment that final payment was due covered the full amount of the balance remaining unpaid. As the amount ($14,725.61) did not include the disallowed extra and there was disagreement only as to asserted, but disallowed, charge-backs, it was a liquidated claim sufficient to commence the running of interest as of the time recognized by the Contractor.

The result is that while we affirm allowance of interest, we modify it so that the period begins on September 29, 1955, rather than September 10, 1955. Since nothing remains but simple calculation, the judgment is reversed in part, modified[10] in part and, as modified, affirmed.[11]

Reversed in part, modified in part, and **as** modified affirmed.

9. The Treasurer of the Contractor testified:
"Q. And was there a tender of payment of certain amounts in the event the receipt was obtained?
"A. Yes."
Thereafter, counsel for Contractor in connection with this testimony and the letter of September 29, 1955, stated:

"There is a claim in this case of interest and I think if there is a tender or a showing that a substantial portion, if not all of the amount that is in dispute here has been made I think it would certainly have some weight to be considered insofar as the allowance of interest would be concerned."

---

10. 
| | | |
|---|---|---|
| Allowed by judgment below | $17,780.36 | |
| Disallow the "extra" | 3,054.75 | |
| Principal amount of judgment as modified | | $14,725.61 |
| Interest @ 6% September 29, 1955 to date of judgment, April 1, 1957 | | 1,332.67 |
| Total | | $16,058.28 |

---

11. While the matters in final controversy were really limited to the interest and the extra totaling $4,733.80 on which Contractor prevailed for approximately two-thirds, it was necessary for Subcontractor to sue for the total balance remaining unpaid on which, of course, it otherwise prevailed. Costs are therefore adjudged two-thirds against Contractor (appellant) and one-third against Subcontractor (appellee).